# UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANETTE C. HORGAN, | : | Civil Action 2:20-1976 |
| Plaintiff, | : | |
| v. | : | |
| GUARDIAN ELDER CARE d/b/a | : | **Jury Trial Demanded** |
| BEAVER VALLEY HEALTHCARE | : | |
| AND REHABILITATION CENTER, | : | Electronically Filed |
| Defendant. | : | |

## COMPLAINT

AND NOW, this 21st day of December, 2020, Plaintiff Nanette C. Horgan, by and through her undersigned attorneys, files the within Complaint against Defendant Guardian Elder Care d/b/a Beaver Valley Healthcare and Rehabilitation Center, and in support thereof avers as follows:

### JURISDICTION AND VENUE

1. This is an action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*.

2. This Court has subject matter jurisdiction over Plaintiff's ADA and FMLA claims pursuant to 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over Plaintiff's related, state law claims pursuant to 28 U.S.C. § 1367.

4. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), because the events giving rise to these claims occurred in this judicial district.

## PARTIES

5. Plaintiff Nanette C. Horgan ("Plaintiff" or "Ms. Horgan"), née Nanette Row, is an adult individual residing at 348 Calhoon Road, Aliquippa, PA 15001.

6. Defendant Guardian Elder Care d/b/a Beaver Valley Healthcare and Rehabilitation Center ("Defendant" or "Guardian Elder Care") operates an elder care facility at 257 Georgetown Road, Beaver Falls, PA 15010 ("Beaver Valley Facility").

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. Plaintiff filed a charge of discrimination with the Pittsburgh branch of the Equal Employment Opportunity Commission (EEOC) on or about May 22, 2020.

8. Ms. Horgan's charge of discrimination was dual-filed with the Pennsylvania Human Relations Commission (PHRC).

9. On December 14, 2020, Ms. Horgan received a Notice of Right to Sue from the EEOC. *A true and correct copy of Horgan's EEOC charge and Notice of Right to Sue is included with this Complaint, collectively, as Exhibit A.*[1]

## FACTUAL BACKGROUND

10. Guardian Elder Care is a privately owned healthcare organization providing services to communities in Pennsylvania, Ohio, and West Virginia.

11. Guardian Elder Care operates an elder care facility in Beaver County, Pennsylvania ("Beaver Valley Facility").

12. At its Beaver Valley Facility, Guardian Elder Care provides both short- and long-term rehabilitation services to senior citizens.

---

[1] Ms. Horgan's EEOC documentation was filed under her maiden name, Nanette Row.

13. Ms. Horgan was hired by Beaver Valley's prior operator, Oak HRC Beaver Valley LLC, in June 2017 as a Registered Nurse Supervisor.

14. Ms. Horgan worked for Beaver Valley and its predecessor in several positions between June 2017 and May 2020.

15. Effective June 1, 2018, Guardian Elder Care took over operations of the Beaver Valley Facility from Oak HRC.

16. Ahead of this change in ownership, in May 2018 Guardian Elder Care offered Ms. Horgan a position as a Unit Manager.

17. In December 2019, Guardian Elder Care promoted Ms. Horgan briefly to the position of Assistant Director of Nursing ("ADON"), and then promoted her again a week later to the position of Director of Nursing ("DON").

18. After experiencing chronic stress and anxiety on a daily basis, in April 2020 Ms. Horgan stepped down from the DON position and once again became the Facility's ADON.

19. When Ms. Horgan was working as Guardian's DON and ADON, she regularly reported to Nursing Home Administrator Nicole Bobitski ("Bobitski").

20. When Ms. Horgan was working as Guardian's DON and ADON, she worked with Guardian's Regional Director of Human Resources Jaclyn Rauscher ("Rauscher") and regularly communicated with Ms. Rauscher regarding human resources matters at the Beaver Valley Facility.

**a. Plaintiff put Guardian on notice of her disability status.**

21. Ms. Horgan suffers from recurring, diagnosed depression and anxiety. She has periodically sought treatment for these disorders, beginning approximately ten years ago.

22. Around February 2020, Ms. Horgan took several days off of work due to illness.

23. Upon returning to work, Ms. Bobitski discussed Ms. Horgan's health with her, and said, "you've been so sick lately because you're so run down."

24. Upon information and belief, Ms. Bobitski was attributing Ms. Horgan's incapacity to work in April 2020, in part, to the symptoms of her disabilities (i.e. her tiredness, problems with concentration, and changes in physical appearance exhibited on the job).

25. Ms. Horgan's symptoms worsen and become more difficult to control under periods of particular stress.

26. For several months, Ms. Horgan experienced significant on-the-job stress that exacerbated the symptoms of her depression and anxiety. She became increasingly depressed, anxious, experienced insomnia, and was having marital problems relating to the toll her job stress took on her.

27. Ms. Horgan sought the advice and treatment of her primary care physician to address these issues, including several remote consultations with her doctor in April 2020 requesting help with sleeplessness, problems focusing, anxiety, and worsening depression.

28. To address these medical concerns, Ms. Horgan's health care provider prescribed a regimen of antidepressants.

29. In the weeks before May 6, 2020, Ms. Rauscher would often comment on Ms. Horgan's appearance and ask if she was feeling well, as she appeared physically ill and tired at work.

30. On or about May 5, 2020, Ms. Horgan reached out by telephone to Guardian's Corporate Administrator Anthony Disser. During her phone call with Mr. Disser, Ms. Horgan discussed diagnosed depression and anxiety and told him that her current work environment was exacerbating the symptoms of those conditions.

31. During this call, Ms. Horgan disclosed to Mr. Disser that she was prescribed a course of antidepressants to alleviate the symptoms she was experiencing.

32. On or about May 6, 2020, Ms. Horgan once again spoke to Nicole Bobitski and Jaclyn Rauscher about her stress and anxiety on the job. During that discussion, Ms. Horgan confirmed that her mental condition was worsening, as she experienced increased sleeplessness and lack of focus.

33. During the May 6 meeting, Ms. Rauscher told Ms. Horgan that she was saddened that Ms. Horgan had to go on medication because of her job.

34. During the May 6 meeting, the participants discussed Ms. Horgan taking time off from work to address her mental health concerns.

35. After some discussion, the administrators and Ms. Horgan decided that Ms. Horgan would take a week off of work to recuperate from May 10 through May 15.

36. During this meeting, Ms. Horgan's time off of work was never discussed as a "vacation."

37. After this meeting, the Defendant's DON Steve Shannon directed Ms. Horgan to assume the duties of the facility's Unit Manager for the facility's 2nd Floor for the remaining few days before this scheduled leave of absence.

**b. Plaintiff was physically ill at work and requested to take a sick day ahead of a scheduled week off.**

38. On May 7, 2020, Ms. Horgan performed her Unit Manager duties throughout her scheduled shift.

39. At the end of her shift, Ms. Horgan arrived at the customary "Stand-Down" meeting to assess the next shift of specific client needs.

5

40. However, Ms. Horgan was pulled out of the Stand-Down meeting room by Nicole Bobitski.

41. Ms. Bobitski took Ms. Horgan to a separate office and began admonishing Ms. Horgan for failing to conduct "Guardian Angel Rounds" that morning.

42. Guardian Angel Rounds are duties performed by the ADON.

43. Ms. Horgan admitted that she did not perform the ADON Guardian Angel Rounds, as she was working as the 2nd Floor Unit Manager that day.

44. The facility's Unit Managers are required to stay on their designated floor to manage day-to-day client care needs, and they can only leave their designated floors on a very limited basis.

45. During the meeting, Ms. Horgan became visibly upset, anxious, and agitated.

46. At the end of the meeting, Ms. Horgan excused herself from Ms. Bobitski's office, went to the restroom, and began to vomit.

47. Ms. Horgan then went to her car and proceeded to vomit again in the Facility parking lot.

**c. Guardian issued Plaintiff an ultimatum and constructively terminated her.**

48. Upon arriving home, Ms. Horgan received a series of text messages from Nicole Bobitski.

49. Ms. Horgan's communication with Ms. Bobitski occurred solely via text message. A true and correct copy of Ms. Horgan's text message conversation with Ms. Bobitski is included with this Complaint as Exhibit B.

50. Ms. Horgan and Ms. Bobitski discussed the following over text message:

      a.      Ms. Row told Ms. Bobitski that she had left at the end of her shift after being physically ill and vomiting in the workplace.

      b.      Ms. Bobitski issued an ultimatum that Ms. Horgan was expected to return to work the next day or it would be assumed that she had abandoned her job, writing "Nanette I'm sorry but your leave was not approved to start tomorrow. You are on the schedule and I am expecting you to work your shift. If you do not come to work, I will assume you have decided to move on from your position. Thank you."

      c.      In response to the ultimatum, Ms. Horgan expressed that she did not want to resign but that she was not well enough to come into work the following day.

      d.      After messaging regularly for 36 minutes, Ms. Bobitski became unresponsive for almost an hour after issuing her ultimatum.

51.      In response to Ms. Bobitski's ultimatum, Ms. Horgan tendered her resignation, because she felt she had no choice given the options that were presented to her by her employer.

52.      Guardian understood that Ms. Horgan requested a single day off on May 8 to address the physical symptoms of her disabilities.

53.      Ms. Horgan was incapacitated and unable to return to work from May 8 through her scheduled week-long leave of absence.

54.      Ms. Bobitski never requested that Ms. Horgan provide a doctor's excuse relating to this request to take a single day off of work ahead of her scheduled medical leave.

55.      Ms. Bobitski never provided Ms. Horgan with notice of her right to take leave under the Family and Medical Leave Act for either her scheduled week-long leave of absence or the requested additional day off.

56. Defendant's sick-leave policy required employees to notify their supervisors just two hours before they missed a shift due to illness.

57. Guardian Elder Care did not typically require employees to provide doctor's notes *before* they were allowed to take a sick day.

58. Guardian Elder Care does not require employees to specifically use the words "sick day" before they can request to take a day off of work to recuperate from an illness or disability.

59. At the time that Ms. Horgan informed her supervisor that she was too sick to work on May 8th, Ms. Horgan had available "banked" sick days that she was free to use in accordance with Guardian Elder Care's regular sick leave policy.

### COUNT I: DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE
### AMERICANS WITH DISABILITIES ACT
### 42 U.S.C.A. § 12112

60. The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

61. Title I of the ADA provides that no "covered entity shall discriminate against a qualified individual on the basis of disability." See 42 U.S.C.A. § 12112(a).

62. Defendant Guardian Elder Care is a covered entity under the ADA as an employer who has 15 or more employees for 20 or more calendar weeks in the current year. See 42 U.S.C.A. §§ 12111(2), 12111(5)(A).

63. "Discrimination" under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an […] employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship…" See 42 U.S.C.A. § 12112(b)(5)(A).

64. Ms. Horgan's chronic anxiety and depression constitute disabilities, insofar as these conditions substantially affect her major life activity of thinking and substantially limit her ability to work without accommodation.

65. Ms. Horgan is a qualified individual with a disability under the ADA.

66. Defendant was put on notice of Ms. Horgan's disabilities through her conversations with Bobitski, Rauscher, Shannon, and Disser about her depression, anxiety, and stress problems and her physician's course of treatment to address those symptoms.

67. Defendant never engaged in an interactive process with Ms. Horgan to determine effective or appropriate reasonable accommodations for her disabilities, specifically regarding her request for a day off work on May 8.

68. Allowing Ms. Horgan to take a single sick day pursuant to their existing leave policy would not have caused Guardian a substantial hardship.

69. Defendant's failure to engage in the interactive process and refusal to accommodate Ms. Horgan's recognized, diagnosed disability constitutes disability discrimination in violation of the ADA.

### COUNT II: DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE
### PENNSYLVANIA HUMAN RELATIONS ACT
### 43 P.S. § 955

70. All preceding paragraphs are incorporated as though fully set forth herein.

71. Plaintiff is a qualified individual with disabilities within the meaning of the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq.*.

72. Plaintiff was/is able to perform the essential functions of her job with a reasonable accommodation

73. Defendant acted with malice and reckless indifference to Plaintiff's civil rights and emotional and physical wellbeing.

74. Defendant has violated the PHRA by failing to engage in the interactive process of determining a reasonable accommodation for Plaintiff, depriving her of pay and benefits, and ultimately constructively terminating Plaintiff's employment on the basis of her actual and/or perceived disabilities, and/or in retaliation for Plaintiff's requests for reasonable accommodations.

75. As a result of Defendant's deliberate, unlawful, and malicious actions as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, emotional pain and suffering, emotional distress and humiliation.

76. The conduct described above constitutes a violation of the PHRA and affords Plaintiff the opportunity to seek any and all remedies available under said Act.

### COUNT III: RETALIATION AND/OR CONSTRUCTIVE TERMINATION
### AMERICANS WITH DISABILITIES ACT
### 42 U.S.C.A. § 12112

77. The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

78. At all times relevant hereto, Plaintiff was an employee of Defendant within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.

79. Under the ADA, it is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203.

80. Defendant was aware of Plaintiff's disability and/or regarded Plaintiff as being disabled

81. Ms. Horgan engaged in protected activity by requesting accommodations for her disabilities.

82. Guardian Elder Care put Ms. Horgan in an untenable position where she was forced to decide between either: (1) attending work on May 8 when she knew that she was unwell and unable to complete the essential functions of her job due to her exacerbated disability symptoms, (2) miss work and—despite her notice—be considered to have abandoned her position by Ms. Bobitski, or (3) resign.

83. Given no other feasible option and an employer that refused to discuss her request for a reasonable accommodation, Ms. Horgan felt that she had no choice but to resign.

84. A reasonable employee in Ms. Horgan's position would feel compelled to resign as she had.

85. Defendant acted with malice and reckless indifference to Plaintiff's civil rights and emotional and physical wellbeing.

86. Defendant Guardian Elder Care retaliated against Ms. Horgan by constructively terminating her employment.

87. As a result of Defendant's deliberate, unlawful, and malicious actions as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, emotional pain and suffering, emotional distress and humiliation.

### COUNT IV: RETALIATION, CONSTRUCTIVE TERMINATION
### PENNSYLVANIA HUMAN RELATIONS ACT
### 43 P.S. § 955

88. The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

89. Plaintiff was/is able to perform the essential functions of her job with or without a reasonable accommodation.

90. Ms. Horgan engaged in protected activity under the PHRA by requesting accommodations for her disabilities.

91. Guardian Elder Care put Ms. Horgan in an untenable position where she was forced to decide between either: (1) attending work on May 8 when she knew that she was unwell and unable to complete the essential functions of her job due to her exacerbated disability symptoms, (2) miss work and—despite her notice—be deemed to have abandoned her position by Ms. Bobitski, or (3) resign.

92. Given no other feasible option and an employer that refused to speak with her about her request for a reasonable accommodation, Ms. Horgan felt that she had no choice but to resign.

93. A reasonable employee in Ms. Horgan's position would feel compelled to resign as she had.

94. Defendant acted with malice and reckless indifference to Plaintiff's civil rights and emotional and physical wellbeing.

95. As a result of Defendant's deliberate, unlawful, and malicious actions as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, emotional pain and suffering, emotional distress and humiliation.

## COUNT V: FMLA RETALIATION
## 29 U.S.C. §2615

96. The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

97. Defendant engaged in an industry affecting commerce and employed 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.

98. Ms. Horgan was an "eligible employee" under the FMLA, as she (1) worked for a covered employer, (2) worked 1,250 hours during the 12 months prior to the start of leave, (3) worked at a location where 50 or more employees work at that location or within 75 miles of it, and (4) worked for her employer for more than 12 months.

99. Ms. Horgan's stress, anxiety, and depression constitute "serious health conditions" under the FMLA, as they are chronic conditions resulting in periods of incapacity that Ms. Horgan received continuing treatment from health care providers to address and manage.

100. Likewise, Ms. Horgan's stress, anxiety, and depression constitute "serious health conditions" under the FMLA as they are chronic condition requiring periodic treatment during times of particular stress or aggravation.

101. Ms. Horgan put her employer on notice of her own serious health conditions in her discussions with Bobitski, Rauscher, Shannon, and Disser about her depression, anxiety, and stress problems and her physician's course of treatment to address those symptoms.

102. Ms. Horgan provided adequate notice to Defendant of her need for medical leave when she notified Ms. Bobitski on May 7, 2020 that she was experiencing physical symptoms of her anxiety disorder—namely, vomiting in the workplace—and that she needed to begin her leave of absence on May 8, 2020 to address those symptoms.

103. Ms. Horgan notified Ms. Bobitski on May 7, 2020 that the symptoms of her serious health condition rendered her unable to perform the functions of her job on the following day.

104. In doing so, Ms. Horgan followed her employer's usual and customary notice and procedural requirements for requesting leave.

105. While Guardian initially offered some type of leave starting on May 10, the administrators never requested more details about Ms. Horgan's request to take May 8 as either an additional sick day or required extension of her medical leave of absence.

106. The FMLA and regulations promulgated thereunder prohibit an employer from discriminating or retaliating against employees who have exercised rights and/or taken FMLA leave, 29 U.S.C. §2615(a)(2); 29 C.F.R. § 825.220(c).

107. Defendant willfully violated the FMLA and regulations promulgated thereunder, in that they constructively terminated Plaintiff as a result of her request for leave, as more fully set forth above.

108. The aforementioned actions of Defendant constitute retaliation under the FMLA.

109. Defendant's conduct, acts and omissions, as more fully described above, were knowing, willful, and performed in bad faith.

110. Because of Defendant's constructive termination of Plaintiff's employment, Plaintiff has suffered loss of employment, promotion benefits, earnings and earnings potential, other significant benefits, emotional pain and suffering, emotional distress and humiliation.

**REQUEST FOR RELIEF**

**WHEREFORE,** Plaintiff requests that this Honorable Court enter judgment against Defendant and damages in an amount to be determined at trial, as follows:

a. That Plaintiff be awarded actual and consequential damages to make Plaintiff whole, including back pay with prejudgment interest, front pay, and compensation for lost benefits, in an amount to be proven at trial, and other affirmative relief necessary to eradicate the effects of Plaintiff's damages associated with Defendant's discrimination, retaliation, and wrongful constructive termination, plus interest;

b. That Plaintiff be awarded punitive damages in an amount sufficient to punish Defendants for their intentional, wanton, and malicious conduct and to deter similar misconduct;

c. That Plaintiff be awarded liquidated damages pursuant to 29 U.S. Code § 2617;

d. That Plaintiff be awarded the costs of this litigation, including reasonable attorney's fees; and

e. That Plaintiff be awarded such further relief as deemed to be just and proper.

Date: December 21, 2020

Respectfully submitted,

*/s/ Nicholas Pahuta*

Marcus B. Schneider, Esquire
PA I.D. No. 208421
Nicholas Pahuta, Esquire
PA I.D. No. 324355
STEELE SCHNEIDER
420 Ft. Duquesne Blvd., Suite 500
Pittsburgh, PA 15222
(412) 235-7686
(412) 235-7693/facsimile
marcschneider@steeleschneider.com
nickpahuta@steeleschneider.com

*Counsel for Plaintiff*